IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LOUIS A. VICARINI,

    Petitioner,

    v.                                                          Civil Action No.:  ELH-19-3486

WARDEN WALTER WEST,

    Respondent.

**MEMORANDUM OPINION**

Petitioner Louis A. Vicarini is a Maryland prisoner serving a 45-year sentence of incarceration.  He has filed a petition for writ of habeas corpus (the "Petition"), pursuant to 28 U.S.C. § 2254.  ECF 1.  It is supported by several exhibits.  Vicarini raises a Fourth Amendment claim in connection with his conviction in Maryland on the charge of armed robbery and related offenses.  In particular, he challenges a vehicle stop and subsequent vehicle search, contending, *inter alia*, that the police officers "fabricated a story" and wrongfully "placed" him as the armed robber of a pharmacy in Carroll County, Maryland. ECF 1-1 at 1.

The Warden, Respondent, has filed a "Limited Answer" (ECF 5), with exhibits. Respondent asserts that the claim may not be reached by this court based on the principle articulated in *Stone v. Powell*, 428 U.S. 465, 494 (1976), barring federal courts from considering Fourth Amendment claims in § 2254 petitions absent a showing by the petitioner that he was denied a full and fair opportunity to litigate the claim in state court.  ECF 5.

Vicarini filed a reply (ECF 6) with additional exhibits.  He disputes that he was given a full and fair opportunity to litigate the issues.  *Id.*  Moreover, he reiterates that "the officers involved in the case fabricated information that placed [him] as the main culprit."  *Id.* at 2.

No hearing is necessary to resolve the matter. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2018); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons set forth below, the court shall deny the Petition. I also decline to issue a certificate of appealability.

## I.    Background

This case is rooted in the armed robbery of the Finksburg Pharmacy in Carroll County, Maryland on May 11, 2015. Three employees were present during the robbery. Following a jury trial in April 2016 in the Circuit Court for Carroll County (Hecker, J.), petitioner was convicted of 18 charges: three counts of armed robbery, three counts of first-degree assault, three counts of use of a firearm in the commission of armed robbery, three counts of use of a firearm in the commission of first-degree assault, conspiracy to commit armed robbery, theft over $1,000, illegal possession of a firearm, possession with intent to distribute a controlled dangerous substance (oxycodone), and possession with intent to distribute a controlled dangerous substance (Alprazolam, a.k.a. Xanax). *See* ECF 5-1 at 76-77 (Vicarini appellate brief); ECF 1-1 at 32 (post-conviction opinion)). He was sentenced to a total term of 45 years, as noted. Thereafter, the Maryland Court of Special Appeals affirmed the convictions in a per curiam opinion issued on June 2, 2017. *See Vicarini v. State of Maryland*, No. 896, Sept. Term 2016 (June 2, 2017) (per curiam); ECF 5-1 at 93-97 (same).

Vicarini filed for post conviction relief in the State on October 20, 2017. ECF 1-1 at 28. It was heard on December 19, 2018. *Id.* The facts underlying the conviction were summarized by the Circuit Court for Carroll County (Stansfield, J.) in a lengthy post-conviction opinion issued on May 1, 2019. ECF 1-1 at 28-47. That court provided a useful factual summary, taken from

Vicarini's Amended Post Conviction Petition.  ECF 1-1 at 32.  The court recounted, in part, *id.* at

32-34  (internal citations omitted; emphasis in original):

> On May 11, 2015, at approximately 4:30 p.m., an individual entered the Finksburg Pharmacy, located in Carroll County, and pointed a gun at the three employees on duty, Raimon Cary, Helen Clarkson, and Kim Morris, demanding that the employees give him Xanax and Oxycodone.  When Raimon Cary did not move quickly enough, the individual maneuvered behind the counter to procure the desired medications himself.  Mr. Cary testified that the individual was a white male wearing a rubber mask, black hoodie, and "brownish sweatpants."  Mr. Cary, at 5'10", testified that the individual was a little bit shorter than him.  The individual grabbed several bottles of Xanax and Oxycodone, including a decoy prescription bottle that contained a GPS tracker, and deposited them into a nylon drawstring bag.  After approximately 3 minutes, the masked individual fled the pharmacy with the stolen medications.  After the individual had exited the pharmacy, Mr. Cary observed him run into the parking lot and "across Route 140."  The employees immediately locked the pharmacy and called 911 to report the incident.  The three pharmacy employees each testified that they were in fear for their safety during this incident.

> Officer Zachary Smalls[1] of the Baltimore County Police Department testified that on May 11, 2015, around 4:30 p.m., he was off duty and driving down Route 140 in Carroll County.  As Off. Smalls approached the stretch of Route 140 where the Finksburg Pharmacy is located, he observed an individual running across the road.  Off. Smalls testified that this individual was wearing a dark colored hoodie and dark colored "Capri" pants and was carrying a blue bag.  Finding this unusual, Off. Smalls kept an eye on the individual and observed him enter a white Chevy Impala.  Off. Smalls called 911 to report this information and he was alerted that a criminal incident had occurred in the area.  Upon gaining this information Off. Smalls did a U-turn and caught up with the white Chevy Impala.  During this time, Off. Smalls lost sight of the Chevy Impala for "less than a minute."  After catching up with a white Chevy Impala, Off. Smalls transmitted that vehicle's tag number over the radio.

> Officer Phillips, a Baltimore City Environmental Police Officer, was notified of this information over his radio and initiated a traffic stop with a white Chevy Impala with a matching tag number.  Shortly thereafter, Off. Smalls assisted with the stop when he arrived on the scene.  Two individuals were discovered in the vehicle, Mr. Vicarini (passenger) and his brother, Michael Vicarini (the driver).  Off. Smalls testified that the passenger, Mr. Vicarini, was the same person he saw crossing Route 140.

---

[1] The record identifies the officer as both "Smalls" and "Small."  I believe the correct surname is "Small."  But,  I shall use the name as it appears in the material that I cite.

Nearby, Deputy Kriete, Jr. was conducting an unrelated traffic stop.  When he heard this information over the radio, he wrapped up the traffic stop and called in additional officers to report to the scene where Off. Phillips and Off. Small[s] had stopped the white Chevy Impala.  The two occupants had already exited the vehicle when Deputy Kriete, Jr. arrived.  Mr. Cary was transported to the location where the vehicle stopped for the purpose of conducting a "show-up" identification.  However, Mr. Cary was unable to identify either the driver or the passenger as the person who robbed the Finksburg Pharmacy, because "[n]either one [was] wearing exactly what the person who came into the store was wearing."

Nevertheless, Mr. Vicarini and his brother were immediately taken into custody.  As the investigating officer, Deputy Kriete, Jr. authored several search warrants, including a search warrant for the white Chevy Impala.  On May 12, 2015, Deputy Kriete, Jr. executed this search warrant while the vehicle was in custody at the Carroll County Sheriff's Office impound lot.  Inside the trunk of the vehicle was a blue drawstring bag that contained a firearm and 37 bottles of prescription medication, including a prescription bottle containing a GPS tracker.  A second firearm was located in the trunk, as well as black facemasks.

At trial, trial counsel questioned Deputy Kriete, Jr. regarding the contents of the search warrant he drafted for the white Chevy Impala.  Deputy Kriete, Jr. testified that in the application for that search warrant he attested that Mr. Cary "described the subject as a white male wearing long jean shorts and a black hoodie."  However, Mr. Cary had never made such a statement, as Mr. Cary testified, as well as Ms. Clarkson and Ms. Morris, that the subject was wearing brownish or white sweatpants or cargo pants.  Deputy Kriete, Jr. testified that Mr. Cary had not reported the subject as wearing "jean shorts," it was Off. Smalls who had made that report.  He testified, "Right, it did go under Mr. Cary's and it should have been under Mr. Smalls."

The record reflects that on March 24, 2016, *i.e.*, prior to trial, the Circuit Court for Carroll County (Titus, J.) held a hearing on Vicarini's pretrial motions.  In particular, the court heard two motions – one challenging the vehicle stop and subsequent search, and the other seeking a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), based on alleged falsehoods contained in the affidavits relied upon to obtain a search warrant for the vehicle.  ECF 5-1 at 77 (Appellate Brief of Vicarini); *see also* ECF 5-2 (transcript of suppression hearing).

The three officers who were involved in the initial stop of the white Chevy Impala testified at the hearing.  They were Officer Zachary Small, an off-duty Baltimore County police officer[2]; Officer Silas Phillips, a Baltimore Environmental Police Officer; and Deputy First Class Douglas Kriete, Jr. of the Carroll County Sheriff's Office.  ECF 5-1 at 53-54.  In the memorandum opinion denying both pretrial motions, the suppression court summarized the evidence provided during the hearing.  ECF 5-1 at 50-68.

Small, a 12-year veteran of the Baltimore County Police Department, claimed he was involved in "approximately 100 robbery apprehensions."  *Id.* at 5.  He was off duty on the afternoon of May 11, 2015, and was driving his personal pickup truck eastbound on Maryland Route 140, toward Green Mill Road.  *Id.*  At that time, he observed an individual run across the westbound travel lanes of Route 140, which aroused his suspicions because westbound traffic was heavy and several cars had to stop abruptly to avoid hitting the pedestrian; the area of the road where the person had crossed was not near a crosswalk, requiring the person to "jump a guardrail in the grass median strip;" the outside temperature was in the mid-80's, "yet the individual had on a dark colored 'hoodie' sweatshirt that was pulled up and tied closely around his face and he appeared to be running fast;" the individual whom he observed was carrying a blue bag; and once the individual reached the eastbound lanes of traffic, Small "had to slam on his brakes out of concern that the individual might run into his lane of travel."  *Id.* at 54-55.

Small testified that in his experience, "such behavior was suspicious and consistent with someone fleeing the scene of a robbery."  *Id.* at 55.  He stopped his truck on the shoulder of the road and observed the individual continue across the eastbound lanes of traffic, jump over the guardrail on the shoulder, and continue to run to a white Chevrolet Impala.  *Id.*  From Small's

---

[2] As noted, the officer was previously identified by the surname "Smalls."

vantage point, he could see the white Impala parked eastbound in the westbound lane of Old Westminster Pike.  *Id*.  He recalled that he was approximately 70 yards from the Impala and his view from the rear window of his truck was unobstructed.  *Id*.  He saw the individual who had been running across the road enter the passenger side of the vehicle; the driver was also in the car. *Id*.

Based on these observations, Small called 911 to report what he had seen and to convey his suspicions about the person's involvement in criminal activity.  ECF 5-1 at 55.  "While he was on the phone with the 911 operator, Small was advised that a call had just come in for an armed robbery at that same location."  *Id*.  After being advised of the recent robbery in the area, Small drove eastbound on Route 140 for a short distance and made a U-turn to travel westbound toward the intersection of Route 140 and Green Mill Road.  *Id*.  Small testified that he lost sight of the Impala for approximately one minute.  *Id*. at 56.

During Small's 911 call, which was recorded and played during the suppression hearing, he relayed that "the passenger was now wearing a white and blue checkered shirt and the driver was wearing a white tee shirt."  ECF 5-1 at 56.  Small then got close enough to the car to report the tag number to the 911 dispatcher.  *Id*.  The 911 dispatcher relayed information to Small that Officer Phillips was on traffic patrol on eastbound 140 at the border of Carroll and Baltimore Counties.  *Id*.

As Small followed the Impala past Phillips and entered Baltimore County, he gestured toward the Impala and honked his horn.  Phillips responded by activating the emergency lights and siren on his vehicle and the Impala stopped.  *Id*. at 56-57.  Small was unarmed and obtained a shotgun from Phillips's patrol vehicle; thereafter, the two officers ordered the occupants out of the

car, handcuffed both men, and cleared the vehicle to ensure no other passengers were in the vehicle. *Id*. at 57.

Small testified that he could see through the windows on the Impala and observed a dark-colored hoodie on the floor behind the driver's seat and a blue bag on the back seat. *Id*. He also testified that he obtained the keys to the car which he found on the ground, opened the trunk of the car to see if anyone was inside the trunk, and closed the trunk after verifying nobody was there. *Id*. Small recalled that the Impala was not searched during the stop while he was there and that he left approximately thirty minutes after the stop was effectuated. *Id*. Small identified Louis and Michael Vicarini as the occupants of the Impala. *Id*.

On May 11, 2015, Officer Phillips was in the area of Route 140 because he was assigned to patrol the Liberty Reservoir Watershed and, in that capacity, he was conducting a traffic stop on the eastbound side of Route 140. ECF 5-1 at 57. During the stop he heard a radio call to be on the lookout for a white Chevrolet Impala connected to a recent armed robbery and learned through additional transmissions that the car was headed toward his location. *Id*. at 58. Phillips recalled ending the traffic stop immediately and waiting at the Carroll County-Baltimore County line for the Impala to arrive. *Id*. When the Impala passed his vehicle, he maneuvered his vehicle behind the Impala and was in communication with the 911 dispatcher when Small pulled up beside him, gesturing toward the Impala. *Id*. Phillips learned from the dispatcher that Small was an off-duty police officer and, with Small's assistance, he initiated a stop of the Impala. *Id*.

After both men in the Impala were in custody, Phillips recalled that they set about clearing the Impala to ensure there were no additional occupants. ECF 5-1 at 58. Phillips remembered being the one who obtained the keys to the vehicle and he opened the trunk, in contradiction to Small's testimony that he had performed that task. *Id*. Phillips's testimony also differed from

Small's inasmuch as Phillips recalled that he left open the trunk of the car, and Small recalled that the trunk was immediately closed. *Id.* Similar to Small's testimony, however, Phillips testified that he could see through the windows on the Impala and observed a dark-colored hoodie on the floor behind the driver's seat as well as a blue bag on the back seat. *Id.* Phillips also identified Louis and Michael Vicarini as the occupants of the Impala. *Id.*

Carroll County Deputy Kriete was informed by radio dispatch on May 11, 2015, that an armed robbery had taken place at the Finksburg Pharmacy by a male suspect who was armed with a handgun, and who had fled on foot with stolen merchandise. ECF 5-1 at 59. The initial report had been received through a 911 call made by Raimon Cary, who reported that he had been robbed and that the assailant had left the store and run across the "travel lanes of Route 140 toward a day care center across the street." *Id.* At the time Kriete received the information, he was conducting a traffic stop on "Route 32 near Changing Seasons Road in Westminster." *Id.* Kriete terminated the traffic stop, "was designated the 'lead deputy' on the call and began heading toward the scene of the robbery." *Id.* Kriete was advised that an off-duty police officer was following the Impala on eastbound Route 140; he knew that Phillips was in that area conducting a traffic stop because he had heard it reported earlier. *Id.* Kriete began heading in that direction and radioed Phillips to ask him to be on the lookout for the Impala. *Id.*

Kriete was close by when the stop of the Impala was initiated by Phillips and Small. ECF 5-1 at 60. As he approached, Kriete saw the Impala coming to a stop with Phillips and Small behind it. *Id.* He parked his vehicle in a manner that blocked traffic on Route 140 and watched as Phillips and Small completed the stop of the Impala and placed the occupants in custody. *Id.* After the Impala was cleared, Kriete took pictures of the vehicle and observed what he described as a "black sweater" inside the car behind the driver's seat. *Id.* Kriete also saw a blue bag on the

back seat of the car. *Id.* Kriete "recalled, and photographs confirmed . . . that the trunk lid had been left open after the vehicle was 'cleared.'" *Id*.

Like Phillips and Small, Kriete testified that no search of the Impala took place at the scene. *Id*. The car was towed to an impound lot where it was secured. *Id.* Kriete explained that it was "out of 'an abundance of caution,' [that] he and Detective W. Murray jointly filed an Application for Search and Seizure Warrant . . . seeking to search the white Impala." *Id.* The warrant was issued by Judge Fred S. Hecker and the Impala was searched on May 12, 2015. *Id*.

Pertinent to the court's consideration of the motion for a *Franks* hearing, the application for the warrant stated, *id.* at 60-61:

> 1. Cary described the assailant as wearing a black hoodie and blue jean shorts; and
>
> 2. Cary was later brought to the scene of the stop for a "show-up" identification. According to the Application, Cary stated Louis' "statue [sic] and shorts were the same, but he was unable to see the suspect [sic] face during the incident."

Additionally, the application noted that Michael Vicarini was found to be in possession of a hypodermic needle and a container filled with numerous pills. *Id*. at 61.

In denying the motion challenging the vehicle stop, the court first observed that the evidence showed that two contemporaneous calls were received by 911 dispatchers and neither call was anonymous. ECF 5-1 at 62. The first call came from the pharmacy and disclosed, *id.* at 62:

> (a) a robbery had just occurred;
>
> (b) that the armed white male robber had fled the pharmacy on foot wearing a dark hoodie and ran across the travel lanes of Route 140 toward a day care center; and
>
> (c) the robber was holding a blue bag.

The second call was from Officer Small, "[a]lmost simultaneously." *Id.* at 63.  He indicated, *id.*:

>   (a)  he was an off duty police officer on Route 140 across from the pharmacy location;

>   (b)  he had just seen a white male individual wearing a dark colored hoodie running across the travel lanes of Route 140 in a sufficiently suspicious manner that he dialed 911; and

>   (c)  such individual was holding a blue bag.

The motion court recounted Small's testimony regarding his observation of the male suspect entering a white Impala; that he followed the vehicle while remaining in constant communication with the 911 dispatcher; that although the passenger's clothing was not the same as had been described, it was his experience that wardrobe changes are not unusual for robbery suspects; no other white Impalas were in the area; and the 911 dispatcher had relayed all of this information to Phillips and Kriete as it was being reported by Small.  *Id.*

The court found Small's testimony "particularly credible" and concluded that "probable cause existed to believe the occupants of the Impala had just been involved in a felony only several minutes earlier."  *Id.*  In particular, the court stated that, "under the totality of circumstances presented, the Court finds that the State met its required burden of proving by a preponderance of the evidence that: (1) the stop of the Impala was supported by probable cause; and (2) the resulting arrest of the occupants was proper."  *Id.* at 64.  Alternatively, the court said that it "would have no difficulty concluding that the State met the reasonable articulable suspicion standard."  *Id.* at 64.  It ruled that "the stop of the Impala was supported by an objectively reasonable, articulable suspicion by law enforcement that criminal activity was afoot."  *Id.* at 65 (citing *Sykes v. State*, 166 Md. App. 206, 217-18, 887 A.2d 1095 (2005)).  Based on this reasoning, the motion court denied the motion to suppress as to the stop of the vehicle.

10

As noted, in his other motion, the defendant requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  The motion was based on the allegation that Kriete's application for the search warrant "'included deliberate falsehoods . . .which, when stricken from the affidavit, would leave it without facts sufficient to establish probable cause.'"  ECF 5-1 at 66.  The asserted falsehoods concerned "Cary's purported identification of Louis [Vicarini] as the robber."  *Id*.

The motion court first found that Louis Vicarini lacked standing to challenge the search of the Impala as the car belonged to his brother and codefendant, Michael Vicarini.  ECF 5-1 at 66 (citing *State v. Wadlow*, 93 Md. App. 260, 271, 611 A.2d 1091 (1992), *rev'd on other grounds* 335 Md. 122, 642 A.2d 213 (1994)).  However, because codefendant Michael Vicarini joined the motion for a *Franks* hearing, the motion court analyzed the merits of the *Franks* motion.  ECF 5-1 at 67.  The court concluded that defendant had failed to meet his burden under *Franks*.  *Id*.

The court reviewed the Supreme Court's decision in *Franks*.  *Id*.  The court then said, *id.* at 67-68:  "First, the facts alleged in the Second Motion fail to demonstrate a substantial likelihood that either of the co-affiants knowingly or recklessly included false information or made intentional misrepresentations in the Application."  The court observed, *id.* at 68 (bold, italics, and underlining in original; (internal record cites omitted):

> Notably, the Second Motion claims that the Application included a statement that Cary had identified Louis "as the robber" despite the aforesaid inconsistency regarding the color of his pants. . . .  Upon the Court's review of the Application, a plain reading of its language compels a different conclusion.  The Application states that at the "show up," Cary advised that Louis' "statue [sic] and shorts were the same, ***but he was unable to see the suspect [sic] face during the incident***." . . . In the Court's judgment, this statement cannot reasonably be considered an "identification" of Louis as the robber.  Rather, the statement in the Application more accurately described a "non-identification" of Louis by Cary who acknowledge he was unable to see the suspect's face at the time of the "show up."

Second, the motion court found that, even if the information in the warrant application rose to the level of intentional, false information concerning Cary's identification of Louis Vicarini as the perpetrator, suppression would not be warranted. *Id.* at 69. In the court's view, even if that information were stricken from the warrant application, the remaining sworn facts, which the court recounted, supported a finding of probable cause. *Id*. at 69.

Therefore, on April 11, 2016, the motions court denied both of Vicarini's motions. *Id.* at 70.

The case proceeded to a jury trial, as noted. The jury convicted Petitioner of 18 charges. ECF 5-1 at 15. In Petitioner's direct appeal, he maintained that the trial court erred in denying his motion to suppress physical evidence recovered from the Chevy Impala because the "police lacked reasonable articulable suspicion to stop the vehicle." ECF 5-1 at 94 (Court of Special Appeals, Unpublished Per Curiam Opinion). In upholding the trial court's decision and affirming Vicarini's conviction, the Court of Special Appeals reasoned as follows, *id.* at 95-97:

> Viewed in the light most favorable to the State, the evidence presented at the hearing on Vicarini's motion to suppress showed that, on May 11, 2015, at approximately 4:36 p.m., the manager of the Finksburg Pharmacy called 911 to report that the pharmacy had just been robbed at gunpoint by a white male, wearing a mask and a black hooded sweatshirt. The manager stated that, after leaving the store, the robber ran across Route 140, "through traffic," and "toward Old Westminster Pike," carrying a blue drawstring bag containing prescription medications that he had stolen from the pharmacy.
>
> Zachary Small, an off-duty Baltimore County police officer, testified that at approximately 4:30 the same day, he was traveling on Route 140 in his personal vehicle, when he observed a white male running from the shopping center where Finksburg Pharmacy is located, and across Route 140, in the midst of moving traffic, requiring drivers to "slam their brakes" in order to avoid him. The male was carrying a "little blue bag" and was wearing a "dark-colored hooded sweatshirt," with the hood up and "tied tight around his face," despite the fact that the outdoor air temperature was over 80 degrees. Officer Small was suspicious of the way the man was dressed and the manner in which he was running. He called 911 to report what he had seen, and was advised by the 911 operator that there had just been a report of a robbery in that area. Officer Small

continued to watch as the male cut through a wooded area and got into the passenger seat of a white Chevrolet Impala that was parked on Old Westminster Pike. The vehicle then made a U-turn and left the area. Officer Small drove to an intersection where he believed the Impala might emerge onto Route 140. After losing sight of the Impala for "a minute," Officer Small saw the vehicle, occupied by two white males, turn onto southbound Route 140. The passenger was not wearing a dark colored hooded sweatshirt, but Officer Small stated that in his experience, suspects will "very often" discard clothing. He began following the vehicle, and communicated the tag number and direction of travel to the 911 operator. Soon thereafter, Officer Silas Phillips, who was conducting an unrelated traffic stop on Route 140, was alerted, by his police radio, to the fact that a suspect vehicle was approaching his location. Officer Phillips stopped the white Chevrolet Impala after he confirmed that the tag number matched that of the suspect vehicle. Officer Small, who had continued to follow the Impala and assisted Officer Phillips in the traffic stop, observed, in the backseat of the Impala, a "hoodie" and the blue bag that he had seen the suspect carrying as he ran across Route 140.

We conclude, based on the totality of the circumstances, that the police had reasonable suspicion to believe that the individuals occupying the white Impala were engaged in criminal activity. Accordingly, the stop of the vehicle was not unlawful, and the circuit court did not err in denying Vicarini's motion to suppress physical evidence recovered as a result of the stop.

Vicarini filed a petition for writ of certiorari with the Maryland Court of Appeals. ECF 1 at 2. It which was denied. *Id.*; ECF 5-1 at 12. And, as noted, he subsequently pursued post-conviction relief in the State court, without success. ECF 1-1 at 28-47.

In his Petition filed with this court, Vicarini claims that the police officers "falsified facts of identification which created the means to support the stop" of the vehicle in which he and his brother Michael were located. ECF 1 at 5. He adds that police lacked reasonable, articulable suspicion when they stopped the car and that the evidence obtained as a result of the stop was "fruit of the poisonous tree," subject to suppression. *Id.* Second, Vicarini claims that the trial court erred when it denied his trial attorney's request for a *Franks* hearing and allowed "the falsified evidence of officers . . . to be used against [him] without the ability to defend against it." *Id.*

## II.    Standard of Review

13

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S. 415, 419-20 (2014) (state prisoner must show state court ruling on claim presented in federal court was "'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.'") (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Pursuant to the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application

of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. In other words, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

### III. Discussion

A.      **The Vehicle Stop**

Federal habeas corpus relief is not available for an alleged Fourth Amendment violation where the petitioner was afforded an opportunity for full and fair litigation of the issue in state court. *Stone v. Powell*, 428 U.S. 465 (1976); *Boggs v. Bair*, 892 F.2d 1193 (4th Cir. 1989), *cert*.

*denied*, 495 U.S. 940 (1990); *Doleman v. Muncy*, 579 F.2d 1258 (4th Cir. 1978).  As observed by the Supreme Court, the purpose of excluding evidence obtained in violation of the Fourth Amendment is to deter misconduct of law enforcement officers conducting the searches.  *See Stone*, 428 U.S. at 490-492.  Providing an additional avenue for exclusion of evidence through federal habeas relief is unlikely to deter misconduct.  Thus, the proper focus is on whether the Fourth Amendment claim was previously given full and fair consideration in the state courts.  *Id.*

Here, Vicarini, through defense counsel, presented his Fourth Amendment claim to the Circuit Court for Carroll County and a suppression hearing was held.  Witnesses were called and cross-examined.  Thereafter, the claim was presented for review to the Maryland intermediate appellate court.  At no point during the State court proceedings was Vicarini prevented from litigating the claim, nor has he pointed to any untoward conduct that rendered the proceedings unfair.  Further, this court is bound by the factual determinations underlying the state courts' conclusion that the stop of the vehicle was lawful.

The Fourth Amendment claim presented here falls squarely within the *Stone* Court's exception to federal habeas review.  The petition shall be denied as to this claim.

**B.**  *Franks* **Motion**

Vicarini claims the trial court erred when it did not hold a *Franks* hearing, as requested by his attorney in connection with the search of the vehicle.  ECF 1 at 5.  The asserted falsehood related to the identification of Vicarini by a pharmacy worker.

The Supreme Court ruled in *Franks v. Delaware*, 438 U.S. 154, 155-6 (1978):

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.  In the event that at that hearing the allegation of perjury or reckless disregard is established by the

16

defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

The Court also said in *Franks*, *id.* at 171:

To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

Similarly, the Fourth Circuit recently reiterated that "to demonstrate that a *Franks* hearing is warranted, 'the accused must make a substantial preliminary showing that false statements were either knowingly or recklessly included in an affidavit supporting a search warrant *and* that, without those false statements, the affidavit cannot support a probation cause finding.'" *United States v. Seigler*, ___ F.3d ___, 2021 WL 800261, at *8 (4th Cir. Mar. 3, 2021) (quoting *United States v. Allen*, 63, F.3d 164, 171 (4th Cir. 2011) (emphasis in *Allen* and *Seigler*).

Notably, "if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-2. The motion court's findings of fact regarding the necessity of a *Franks* hearing were reasonable and the application of the law to the facts was without error. Therefore, federal habeas relief is unavailable on this claim.

## IV.    Certificate of Appealability

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S.Ct. 759, 773 (2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

This court finds that there has been no substantial showing of the denial of a constitutional right. Therefore, a certificate of appealability shall not issue. *See* 28 U. S.C.§ 2253(c)(2). But, Vicarini may still request that the United States Court of Appeals for the Fourth Circuit to issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate Order follows, denying the petition and declining to issue a certificate of appealability follows.


March 11, 2021                              _____/s/_____
Date                                       Ellen L. Hollander
                                           United States District Judge


18